**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KEVIN REMILLARD,

     Petitioner,    :  Case No. 2:20-cv-6103

  - vs -          District Judge Sarah D. Morrison
              Magistrate Judge Michael R. Merz

WARDEN, Noble
  Correctional Institution,

            :

     Respondent.

**OPINION AND ORDER**

   This habeas corpus case is before the Court on Objections by Respondent (ECF No. 15) and Petitioner (ECF No. 16) to the Magistrate Judge's Report and Recommendations ("Report," ECF No. 14) recommending that the petition be dismissed with prejudice but that a certificate of appealability be granted (ECF No. 14). Following recommittal, the Magistrate Judge filed a Supplemental Report and Recommendations ("Supplemental Report," ECF No. 18) to which only Petitioner has objected (ECF No. 19).

   Litigants who object to a Magistrate Judge's recommendations on a dispositive matter, such as disposition of a habeas corpus petition, are entitled under Fed.R.Civ.P. 72(b)(3) to *de novo* review by the assigned District Judge of any portion of the report and recommendations to which substantial objection is made. This Opinion and Order embodies the results of the District Judge's *de novo* review.

1

## I.     Transfer of the Magistrate Judge Reference in this Case

Petitioner objects to the transfer of the Magistrate Judge reference in this case from
Magistrate Judge Elizabeth Preston Deavers to Magistrate Judge Michael R. Merz,
suggesting the Magistrate Judges of this Court "can trade cases like kids used to trade
baseball cards."  (ECF No. 19, PageID 1256-57.)  The suggested analogy is offensive and is
completely unreflective of the facts.

Magistrate Judge Merz retired as an active Magistrate Judge on March 29, 2011 and
has served continuously since then on recall.  It is the practice throughout the country to
use recalled Magistrate Judges in judicial districts and on a variety of cases where the need
is greatest.  For example, at the present time, other recalled Magistrate Judges of this Court
are assisting with Social Security disability cases in the Western District of New York and
the District of New Jersey.

Since 1995 Magistrate Judge Merz has handled a substantial portion of the capital
habeas corpus cases in this District, regardless of the location of court at which they were
filed.  Because of that experience, the Magistrate Judge reference in *In re:  Ohio Lethal
Injection Protocol,* Case No. 2:11-cv-1016, was transferred to him from a Columbus
Magistrate Judge in 2015.  The case involves virtually all of Ohio's death row inmates and
has an accumulated over 3,700 entries and an almost 170,000-page record.

Magistrate Judge Merz has been automatically referred all the habeas corpus cases
filed at the Dayton location of court since 2013 (See General Orders Day 13-01 and 21-01).
He obtains reference of habeas corpus cases from other locations of court only on the
initiative of the transferor Magistrate Judge.  Sometimes the transferor Magistrate Judge
signs the relevant order and sometimes Magistrate Judge Merz does, but those orders

always reflect the consent of both Magistrate Judges involved.  Such transfers do not affect the District Judge assignment and thus the venue of the case.

Petitioner's objection to the transfer of the Magistrate Judge reference in this case is therefore completely without merit and is overruled.

## II.  Constitutionality of the Antiterrorism and Effective Death Penalty Act of 1996

Because this case was filed after April 24, 1996, it is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214) (the "AEDPA"). *Lindh* v. *Murphy*, 521 U.S. 320 (1997).  Respondent thus argued the ways in which the AEDPA is applicable to the case (Return, ECF No. 9, PageID 1075, n.1 and many subsequent places).

In his Traverse and both sets of Objections, however, Petitioner has argued at length that the AEDPA is unconstitutional on four grounds: (1) as a violation of separation of powers doctrine; (2) as a suspension of the writ of habeas corpus; (3) as a violation of the "Citizenship" Clause of the Fourteenth Amendment; and (4) as a perpetuation of a "badge and incident" of slavery in violation of the Thirteenth Amendment.

The question of the constitutionality of the AEDPA is of course properly put to this Court.  *Marbury v. Madison*, 5 U.S. 137, 2 L. Ed. 60 (1803).  However, as the Report notes, analysis must begin with a strong presumption that Congressional enactments are constitutional (ECF No. 14, PageID 1156-57, citing *Rostker v. Goldberg,* 453 U.S. 57, 64 (1981); *Fullilove v. Klutznick*, 448 U.S. 448, 472 (1980); *Columbia Broadcasting System, Inc., v. Democratic National Committee,* 412 U.S. 94, 102 (1973); *United States v. Five Gambling Devices,* 346 U.S. 441, 44 (1953); and *Fairbank v. United States*, 181 U.S. 283 (1901).

Petitioner objects in particular to the constitutionality of 28 U.S.C. §§  2254(d)(1)

and (2) which require federal habeas courts to defer to state court decisions on

constitutional questions later presented in the habeas case unless the state court decision

is (d)(1) "contrary to or an unreasonable application of clearly established Federal law as

determined by the Supreme Court of the United States" or (d)(2) "based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." AEDPA is unconstitutional, Petitioner argues, because United States citizens

have a constitutional right to a federal court *de novo* decision on law and fact:

> the application of the federal Constitution in the habeas corpus context must
> not depend on the State where the criminal trial took place or the State's
> judiciary and its interpretation of the federal Constitution. The habeas
> petitioner has a U.S. citizenship right to the protections of the Fourteenth
> Amendment to the federal Constitution being applied correctly to the correct
> facts of his or her case regardless of the particular State where he is seeking
> vindication of his federal constitutional rights.

(Traverse, ECF No. 12, PageID 1123). On the same basis, Petitioner argues 28 U.S.C. §

2254(e) which governs the availability of evidentiary hearings in habeas cases is

unconstitutional. Instead, he argues "If a federal judge needs to hold an evidentiary hearing

to determine the relevant facts in deciding whether the federal Constitution has been

violated, then he or she can not [sic] be retrained [sic] by a State judge's factual findings."

(ECF No. 12, PageID 1136).

### A. Violation of Separation of Powers

No court has every held the AEDPA to be unconstitutional on any of the grounds

asserted by Remillard, but he relies on the dissent of Judge Lipez from denial of rehearing

*en banc* in *Evans v. Thompson,* 524 F.3d 1 (9th Cir. 2008). Judge Lipez dissented from the

panel's decision which accepted as constitutional § 2254(d)(1)'s limitations on the source

of law for habeas decisions to Supreme Court precedent and evaluation of state court

4

decisions on constitutional questions to whether those decisions were reasonable, as opposed to correct.  Judge Lipez believed these restrictions violated fundamental principles of separation of powers and noted support for his position in:

> a dissent from the denial of rehearing en banc by Judge Reinhardt and joined by Judges Pregerson, Gould, Paez, and Berzon, *see Crater v. Galaza,* 508 F.3d 1261 (9th Cir.2007), a dissent from the denial of rehearing *en banc* by Judge Martin, and joined by Judges Daughtrey, Moore, Cole, and Clay, *see Davis v. Straub,* 445 F.3d 908 (6th Cir.2006), a concurring opinion by Judge Noonan, *see Irons v. Carey*, 505 F.3d 846, 854 (9th Cir.2007), and a dissenting opinion of Judge Ripple, joined by Judge Rovner, *see Lindh v. Murphy,* 96 F.3d 856, 885 (7th Cir.1996).

524 F. 3d at 1.  The Magistrate Judge noted that there was no authoritative precedent involved and the questioned statutes had been applied hundreds of times a week for twenty-five years without any court finding them unconstitutional. (Report, ECF No. 14, PageID 1158).

Indeed, the Supreme Court itself has frequently over that period strengthened the deferential impact of the statutory language.  In *Williams v. Taylor*, 529 U.S.362 (2000), the Court held a state court application of Supreme Court precedent must not only be "unreasonable," it must also be "objectively unreasonable."  A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter,* 562 U.S. 86, 101 (2011), quoting *Yarborough* v. *Alvarado*, 541 U.S. 652, 664 (2004).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous."  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable."  *Id*.  Judge Merritt, one of the jurists on whom Judge Lipez relied, has written "[T]he AEDPA standard is 'difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard

against extreme malfunctions in the state criminal justice system, and not as a means of error correction.' *Peak v. Webb*, 673 F.3d 465(6th Cir. 2012) (Merritt, J., concurring), *quoting Greene v. Fisher*, 565 U.S. 34 (2011).  To the same effect are *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Woods v. Donald*, 575 U.S. 312 (2015) (per curiam GVR), reversing *Donald v. Rapelje,* 580 Fed. Appx. 277 (6th Cir. 2014); *Virginia v. LeBlanc,* 582 U.S. __, 198 L. Ed. 2d 186 (2017) (GVR).

While 28 U.S.C. § 2254(d)(1)[1] may lessen the authority of lower federal court judges to interpret the Constitution as they deem proper, it strengthens the hand of the Supreme Court in declaring uniform national interpretations of the Constitution.  Petitioner argues that a prisoner's constitutional rights must not depend on the State in which he or she is tried, but § 2254(d)(1) eliminates or greatly diminishes the differences in rights application prisoners will suffer from State to State or from federal circuit to federal circuit. In that way § 2254(d)(1) strengthens the judicial branch as a whole and uniformity of decision in particular.  The Court does not agree that 2254(d)(1), (d)(2) or (e) violates separation of powers doctrine.

### B.    Violation of the Suspension Clause

In addition to his separation of powers argument, Remillard asserts the AEDPA violates the Suspension Clause which provides "The Privilege of the Writ of Habeas Corpus shall not be suspended, except when in cases of Rebellion or Invasion the public safety may require it."  In contrast to the several decisions which shared his separation of powers argument, Remillard cites only Judge Boyce Martin's dissent from denial of rehearing *en banc* in *Davis v. Straub,* 445 F.3d 908 (6th Cir. 2006), in favor of his Suspension Clause

---

[1]None of the dissenting judges cited by Petitioner speak to § 2254(d)(2) or (e).

argument, although Judge Martin was joined in dissent by Judges Daughtrey, Moore, Cole, and Clay and repeated arguments made in his panel dissent by Judge Merritt.  The argument is that § 2254(d)(1) "so broadly circumscribes the writ of habeas corpus that we cannot reach the full merits of the constitutional issue[s] before us." 445 F.3d at 911, quoting *Davis*, 430 F.3d at 299 (Merritt, J., dissenting).  Judge Martin further relies on Justice Scalia's dissent in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), which stated "The Suspension Clause of the Constitution, which carefully circumscribes the conditions under which the writ can be withheld, would be a sham if it could be evaded by congressional prescription of requirements *other than the common-law requirement of committal for criminal prosecution* that render the writ, though available, unavailing."

This very broad reading of the Suspension Clause is inconsistent with the Supreme Court's early and consistent interpretation that the power to grant the writ extends only to those cases in which Congress has authorized it by statute.  "[T]he power to award the writ [of habeas corpus] by any of the courts of the United States, must be given by written law," not common law. *Hueso v. Barnhart*, 948 F.3d 324, 326-327 (6th Cir. 2020), quoting *Ex parte Bollman*, 8 U.S. 75, 94, 2 L. Ed. 554 (1807).  If the writ protected by the Suspension Clause reaches anyone "committed for criminal prosecution" as Petitioner argues, how to justify the exclusion of state prisoners from seeking the writ until Congress extended the writ to them after the Civil War?

The Magistrate Judge noted the lack of judicial support for Petitioner's Suspension Clause argument but mentioned without analyzing that Petitioner "cites a good deal of academic commentary questioning the AEDPA under the Suspension Clause." (Supplemental Report, ECF No. 18, PageID 1226, citing Objections, ECF No. 12, PageID

1117-18).  Remillard objects:

> What is bothersome is this court's refusal to engage in discussion or analysis of issues and facts unless there is exactly on point a controlling case. The court's refusal to engage the "academic commentary" does nothing to advance the debate or decide the important constitutional questions presented. PageID #1226. Mr. Remillard respectfully objects.

(ECF No. 19, PageID 1259).

The first academic item cited by Remillard is a student comment, "The Wall That AEDPA Built: Revisiting the Suspension Clause Challenge to the Antiterrorism and Effective Death Penalty Act, 66 Case Western L. Rev. 1147 (Summer 2016) by Nathan Nasrallah, at the time a J.D. candidate at Case Western, the publishing institution.  Nasrallah notes that Suspension Clause arguments have been made against AEDPA since shortly after its enactment but have all been unsuccessful. *Id.* at 1182, citing *Lindh v. Murphy*, 96 F.3d 856 (7th Cir. 1996); *Green v. French, 143 F.3d 865 (4th Cir. 1998); and Crater v. Galaza,* 491 F.3d 1119 (9th Cir. 2007).  But, he argues, a Suspension Clause argument is more likely to succeed now because Supreme Court interpretations of AEDPA, particularly *Harrington* and *Cullen v. Pinholster*, 563 U.S. 170 (2011), have prescribed even more deference to state court decisions than earlier interpretations.  Nasrallah fails to explain why a Supreme Court that has become even more deferential would radically shift course and find § 2254(d)(1) violates the Suspension Clause.  In fact, Nasrallah confesses the quixotic nature of his argument by writing "While it is unlikely that the Supreme Court would find that its own statutory interpretation violates the Constitution, a well-argued Suspension Clause challenge can expose AEDPA's friction with important legal principles and may pressure Congress to take action."  66 Case Western L. Rev. at 1149-50.

Having engaged with Nasrallah's Comment, the Court is not persuaded to adopt its

argument.  To do so would be to ignore twenty-five years of Supreme Court interpretation of AEDPA in favor of what Nasrallah calls a "functionalist" approach to the writ.  The Supreme Court has written "Unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 375 (1982).  This Court is not authorized to ignore Supreme Court precedent and adopt a wholly-unprecedent functionalist approach to the writ.

In "Un-Incorporating the Bill of Rights: The Tension Between the Fourteenth Amendment and the Federalism Concerns that Underlie Modern Criminal Procedure Reforms," 98 J. Crim. L. & Criminology 1231 (2008), Justin Marceau argues that "§ 2254, as currently applied, is inconsistent with the Fourteenth Amendment's incorporation doctrine." *Id.* at 1232.  He explains:

> The hallmark of incorporation under the Fourteenth Amendment, or more precisely, selective incorporation, is the promise that constitutional rights must apply with the same force and breadth in each of the fifty states, a promise that is impossible to realize under the strictures of § 2254.

*Id.*

Habeas corpus procedural reform was key to the incorporation program of the Warren Court.  Because the Supreme Court could not possibly review on certiorari all cases in which it was alleged that state courts had not followed the Constitution, the Supreme Court devolved front-line responsibility for that task to the District Courts.  In *Fay* v. *Noia*, 372 U.S. 391 (1963), the Court held a federal habeas court could consider any constitutional claim despite failure to present it to the state courts unless the failure was the result of a "deliberate bypass."  It also emphasized that issuance of the writ was governed by "equitable principles."  In *Townsend v. Sain*, 372 U.S. 293 (1963), decided the

same day as *Fay*, the Court provided very broad authority for district courts to re-hear *de novo* the facts of habeas cases. To manage the flood of cases these changes and Title VII of the 1964 Civil Rights Act created, Congress created the office of United States Magistrate in 1968.[2]

But keeping the "incorporation promise" as Marceau calls it depends heavily on the vertical precedent doctrine reinforced in *Hutto*, which, because of the Supremacy Clause and their oaths of office, applies equally to state court judges and lower federal court judges. As Marceau details, it is the Supreme Court's decisional law which has led to what he calls "un-incorporation." His principal example is *Stone v. Powell*, 428 U.S. 465 (1976), which, without overruling *Mapp v. Ohio*, 367 U.S. 643 (1961), made the exclusionary rule unenforceable in habeas if the state courts had provided a full and fair opportunity to litigate the claim. What then is a lower federal court judge to do with a Fourth Amendment claim in habeas? Defy *Stone* and be overturned by the court of appeals by return mail? Or remember that the Supremacy Clause requires us to follow *Stone*? Marceau's argument does not persuade the Court that 28 U.S.C. §§ 2254(d)(1), (d)(2) and (e) are unconstitutional.

Petitioner also cites Marceau's "Challenging the Habeas Process Rather than the Result," 69 Wash. & Lee L. Rev. 85 (2012). There Marceau argues for using 42 U.S.C. § 1983 to challenge state court criminal procedures and does not argue directly for holding §§ 2254(d)(1), (d)(2), or (e) unconstitutional.

The Court is not persuaded by the cited academic commentary that §§ 2254(d)(1), (d)(2), or (e) should be declared unconstitutional under the Suspension Clause.

---

[2]Title changes to United States Magistrate Judge in 1991.

10

**C.** **Violation of the Citizenship Clause**

Petitioner asserts that §§ 2254(d)(1), (d)(2), and (e) somehow violate the Citizenship Clause of the Fourteenth Amendment.  The Magistrate Judge rejected this argument because he found "Remillard cites no decision of any federal court applying the Citizenship Clause to AEDPA, habeas corpus, or the criminal law." (Supplemental Report, ECF No. 18, PageID 1227).

Remillard objects that the Magistrate Judge refused "to engage in the analysis presented in the traverse and simply concludes, in effect, the citizenship clause has no application" and refused to "engage in a detailed discussion and analysis of how 2254 violates the Citizenship Clause of the 14th Amendment."  (Objections, ECF No. 19, PageID 1259-60).

Most of the argument in the Traverse on this is irrelevant.  The Court understands that the Fourteenth Amendment created citizenship status, both state and national, for every person born in the United States.  The Court is well aware of *Brown v. Board of Education*, 347 U.S. 483 (1954), which outlawed racial segregation in public schools as a matter of the Equal Protection Amendment, not the Citizenship Clause.  *Trop v. Dulles,* 356 U.S. 86, 100-101 (1958), is cited to the Court in every death penalty case.  *Obergefell v. Hodges*, 576 U.S. 644 (2015), originated in this Court.  But none of this precedent suggests that every citizen has the absolute right to have his or her state criminal conviction reviewed *de novo* in a federal court, which appears to be Remillard's argument.

Petitioner relies here as in his Suspension Clause argument on academic commentary.  In "Access to the Courts as a Privilege or Immunity of National Citizenship,"

40 Conn. L. Rev. 1477 (2008), Risa Kaufman contends "national citizenship rights are enjoying something of a renaissance. The Privileges or Immunities Clause, dormant since the Court gave it a narrow construction in The Slaughterhouse Cases, was revived by the Court in 1999 in *Saenz v. Roe*," 526 U.S. 489 (1999), a case heavily relied on by Petitioner. However, Professor Kaufman acknowledges that in the years between 1999 and her article in 2008, "the Court has not subsequently relied upon the [Privileges or Immunities] Clause or expanded its holding beyond the right to travel context." *Access* at 1479-80.  Nor has the Court expanded *Saenz* since Professor Kaufman wrote, although Justice Thomas has continued to advocate resurrection of the Privileges or Immunities Clause.  (See his concurrence in part in *McDonald v. City of Chicago*, 561 U.S. 742, 805 (2010), arguing that the right to keep and bear arms is a privilege of national citizenship.)

The focus of Professor Kaufman's article is the academic scholarship on resurrecting the Privileges or Immunities Clause from its virtual eviction from the Constitution in the *Slaughter-House Cases,* 83 U.S. 36 (1873). She concentrates on jurisdiction-stripping statutes and expressly excludes discussion of the AEDPA from her scope.  *Access*, at 1510-11.  Unlike the jurisdiction-stripping legislation she discusses, §§ 2254(d)(1), (d)(2), and (e) do not "strip" the federal courts of jurisdiction in habeas, but prescribe rules for the exercise of that jurisdiction.  The Court also notes how Professor Kaufman's argument that Congress intended to protect a national citizenship right to federal court access is limited, as she admits, by the same Congress's refusal to enact federal question jurisdiction. *Access*, at 1502.

The nub of Petitioner's Citizenship Clause argument is "the application of the federal Constitution in the habeas corpus context must not depend on the State where the criminal

trial took place or the State's judiciary and its interpretation of the federal Constitution. (Traverse, ECF No. 12, PageID 1123). And again "The separate State courts which attempt to apply the federal Constitution in their respective jurisdictions must get it right if Section 1 of the Fourteenth Amendment and national citizenship means anything at all." *Id.* at PageID 1126.

The consequences of adopting this interpretation would be radical. If the state courts do not "get it right," Remillard implies there is an absolute constitutional right to *de novo* consideration in federal district court. But suppose the District Court doesn't "get it right"? Is there a constitutional right to appeal? This would, of course, render unconstitutional the certificate of appealability provisions of the AEDPA.[3] And suppose the circuit court gets it wrong? Is there to be a constitutional right to certiorari review? The only way to guarantee uniformity of result is to guarantee uniformity of final decisionmaker. But limits on Supreme Court review are plainly constitutional: they are written into the text of Article III.

The Court is not persuaded that the Citizenship Clause renders 28 U.S.C. § 2254(d)(1), (d)(2), or (e) unconstitutional.

### D. Violation of the Thirteenth Amendment

Remillard finally contends §§ 2254(d)(1), (d)(2), and (e) are "badges or incidents of slavery" prohibited by the Thirteenth Amendment. He begins by quoting Justice Douglas's catalogue on the historic instances of laws protecting white supremacy for a century after the Thirteenth Amendment was passed. *Jones v. Mayer*, 392 U.S. 409, 445-46 (1968). Half a

---

[3]Even before AEDPA, District Courts were required to consider whether there was probable cause to allow an appeal in habeas cases.

century after *Jones*, there is still much to do to eliminate racism from our national behavior. But none of Justice Douglas's examples suggest that giving deference to state court decisions on questions of the constitutional rights of state prisoners is a badge of slavery.

Remillard notes the disproportionate application of the death penalty in the South and claims "Several provisions of AEDPA reflect the Confederate mind set and enable the death penalty to thrive in the south." (Traverse, ECF No. 12, PageID 1134). It is well known that the Social Security Act discriminated against Black citizens when first passed and that discrimination (by way of excluding much of the work done by Black people) was a price Franklin Roosevelt paid for Southern Congressional votes to pass the Act. Is Social Security unconstitutional as a badge of slavery on that account?

Remillard broadens his attack from Southern Congressmen to all state court judges: "The minds and hearts of many State court judges and justices remain filled with explicit bias, implicit bias and structural bias." And not federal judges? Is the Article III confirmation process so finely honed as to eliminate all vestiges of implicit bias?

In sum, Remillard's Thirteenth Amendment badge of slavery claim proves too much. If every Congressional enactment of the past century and a half that received votes from persons with implicit racial bias is therefore a badge of slavery and unconstitutional, nothing will survive.

Having considered *de novo* Petitioner's arguments that §§ 2254(d)(1), (d)(2), and (e) are unconstitutional, the Court finds them unpersuasive. On the constitutionality of these portions of the AEDPA, the Court adopts the Magistrate Judge's Report and Supplemental Report and overrules Petitioner's Objections.

### III.     Ground One:  Ineffective Assistance of Trial Counsel: Failure to File a Motion to Suppress

In his First Ground for Relief, Remillard claims his trial attorney provided constitutionally ineffective assistance when he failed to file a motion to suppress documents seized from Remillard's home without a warrant.  The Magistrate Judge recommended the Court deny this claim on the merits, deferring to the decision of the Fifth District Court of Appeals. (Report, ECF No. 14, PageID 1165; Supplemental Report, ECF No. 18, PageID 1212).

Although Remillard objects generally that the Fifth District did not decide this claim on the merits, he offers no analysis to support that claim.  Remillard's First Assignment of Error on Direct Appeal was "Counsel was ineffective under the Sixth and Fourteenth Amendments of the U.S. Constitution in failing to File a Motion to Suppress documents seized during a warrantless search of Appellant's bedroom."  (Appellant's Brief, State Court Record, ECF No. 8, PageID 95.)  The Report quoted the entire decision of the Fifth District on this claim and concluded it was plainly a decision on the merits. (ECF No. 14, PageID 1159-61).  Petitioner's conclusory objection that this was not a decision on the merits is overruled.

The Fifth District found, the Magistrate Judge agreed, and Petitioner does not disagree that the Sheriff's deputies who responded to Remillard's residence had probable cause to believe he was suicidal, and this created sufficient exigent circumstances for them to enter the house to perform a "welfare check."  Remillard also does not object to the Magistrate Judge's finding, based on the state court record, that the deputies had the consent of the owner of the premises to enter; in fact, she removed the dogs who would have impeded the welfare check. (Supplemental Report, ECF No. 18, PageID 1209-10).

15

Remillard repeatedly emphasizes the deputies did not enter the house or proceed within it to investigate a crime because "suicide is not a crime." Neither the Fifth District nor the Magistrate Judge found to the contrary. Instead, the Fifth District held, and the Magistrate Judge agreed that entry to prevent suicide was lawful. *State v. Remillard,* 2019-Ohio-3545, ¶ 36 (5th Dist. Aug. 30, 2019), citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Petitioner does not disagree that the initial entry was lawful.

When the deputies reached Remillard's second floor bedroom without having yet encountered either a wounded person or a corpse, they found the document in question. The Fifth District found and the Magistrate Judge agreed that the document was in plain view, i.e., lying on an open surface. At that point the exigent circumstances which justified the entry had not dissipated. Petitioner does not dispute the Magistrate Judge's finding that it is very common for people committing suicide to leave a note. Petitioner also does not dispute that the handwriting on the note appeared to the deputies to be the same as the handwriting on the note Remillard left for his neighbor Daubenspeck with some personal property and which strengthened the suspicion he might be about to kill himself.

Given that set of circumstances, it was completely lawful for the deputies to read the note. It might reasonably have been expected to lead them to Remillard quickly so as to prevent the suicide or prevent his death from a not-yet-fatal wound. Of course, suicide is not a crime, but nowhere does Petitioner suggest that, as the Fifth District held, it is not part of the duties of the police to prevent people from harming themselves. Had the deputies found Remillard armed and about to pull the trigger, nothing in the law would have required them to be passive observers of his suicide. It would be absurd to suggest that police officers, knowing what these officers knew, should stop to go and get a search

16

warrant before reading a note that was reasonably suspected to describe a suicide in progress.

Once the officers read the note, its nature as evidence of a crime was evident.  As Petitioner himself points out, a confession is probably the best evidence of a crime. (Objections, ECF No. 19, PageID 1242, citing McCormick on Evidence (1972) and Wigmore on Evidence (1970)).  Petitioner also does not object to the Magistrate Judge's finding that the incriminating nature of the note was obvious.

Petitioner argues the note was not contraband.  The Court agrees, but neither the Fifth District nor the Magistrate Judge relied on any such classification. Petitioner argues that one's personal papers such as this note are protected by the Fourth Amendment. Again, neither the Fifth District nor the Magistrate Judge suggested they were not. Petitioner contends that the privacy of one's home is the primary interest protected by the Fourth Amendment.  Again, neither the Fifth District nor the Magistrate Judge suggested that Remillard's dwelling was not a protected place.  But Remillard admits: "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (Objections, ECF No. 19, PageID 1242, citing *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978).

Petitioner objects that the Magistrate Judge reads *Arizona v. Hicks,* 480 U.S. 321 (1987) too narrowly.  In that case police entered a second-floor apartment because a shot had been fired from there into the apartment below.  Upon entering the police did not find anyone.  However, they also saw expensive sound equipment, which seemed inconsistent with the general squalor of the apartment.  The nature of the equipment as stolen property was not immediately obvious, so the police moved the equipment to recover serial

numbers which proved the equipment was stolen.

In *Hicks* the exigent circumstances justifying entry dissipated once the apartment was found empty.  It turned out that the officer's suspicions about the sound equipment were justified, but he had to search (move the equipment) to get at the serial numbers.  In this case the exigent circumstance that justified both entry and reading the note in plain view did not dissipate until after the note was read.  The act of reading both dissipated the original cause for entry and created cause to seize the note.

Accordingly, the Magistrate Judge's Report and Supplemental Report as to Ground One are adopted and Petitioner's Objections are overruled.

## IV.    Ground Two:  Ineffective Assistance of Trial Counsel:  Failure to Object to Instructions

In his Second Ground for Relief, Remillard claims his trial attorney provided ineffective assistance of trial counsel when he failed to object to jury instructions.  This claim was raised as Remillard's Second Assignment of Error on direct appeal and decided against him on the merits.  *State v. Remillard, supra.*  As to the first instruction to which Remillard asserted objection should have been made, the Fifth District held it was not a misstatement of Ohio law and there was therefore nothing to which to object.  *Id.* at ¶¶ 42-47.  As to the second such instruction, the Fifth District found an error at one point, but that the instructions on the definition of murder, read as a whole, would not have misled the jury.  *Id.* at ¶¶ 48-56.  Based on that finding and its conclusion that trial counsel's focus was on *mens rea*, it was reasonable for counsel not to object because it could have distracted the jury from the defense theory.  Because the first instruction was not objectionable and not objecting to the second was reasonable strategy, the Fifth District found no violation of *Strickland v. Washington,* 466 U.S. 668 (1984).  The Magistrate Judge found this was a

18

reasonable application of Strickland and thus entitled to deference (Report, ECF No. 14, PageID 1172; Supplemental Report, ECF No. 18, PageID 1216).

In his Objections to the Supplemental Report, Remillard asserts he is entitled to *de novo* consideration[4] of part of his Second Ground for Relief:

> The Ohio court did not decide on the merits the federal constitutional questions concerning Due Process, the "acquit first" jury instructions and whether Mr. Remillard was denied his right to present a complete defense due to the faulty jury instructions and counsel's ineffectiveness in submitting to the court some of the faulty instructions and failing to object to other clearly erroneous jury instructions that cold [sic] have easily been corrected. Since the Ohio court did not decide the issues on the merits, then 2254 (d) does not apply.

(ECF No. 19, PageID 1244). The Court agrees with the Magistrate Judge's analysis of why these claims were decided on the merits by the Fifth District and therefore entitled to deference under 28 U.S.C. § 2254(d)(1). Applying that deference, the Court also agrees that the Fifth District's decision is not an objectively unreasonable application of the relevant Supreme Court precedent. The Report and Supplemental Report as to Ground Two are adopted and Petitioner's objections are overruled.

## V. Ground Three: Trial Court Error in Refusing an Instruction on Accident

In his Third Ground for Relief, Remillard contends the trial court erred when it did not give the instruction he requested on accident and that its failure to do so deprived him of his constitutional right to a present a complete defense. Remillard presented this claim to the Fifth District as his Third Assignment of Error. Noting that he had not properly preserved his objection, the Fifth District reviewed the merits of this claim on a plain error basis. Although this would have permitted the Warden to raise a procedural default

---

[4] That is, *de novo* consideration of the merits without deference under 28 U.S.C. § 2254(d)(1), not just *de novo* review of the Magistrate Judge's Reports.

defense, the State elected to defend on the merits.

Remillard first argued the Fifth District did not decide this claim on the merits and he was therefore entitled to non-deferential review in this Court. The Magistrate Judge disagreed, citing the Supreme Court standard for finding that a state court decision was on the merits (Report, ECF No. 14, PageID 1174). Petitioner objected to the Report because the Magistrate Judge had not analyzed a line of circuit court cases. The Supplemental Report noted Supreme Court authority limiting habeas relief to cases where the state courts unreasonably applied Supreme Court, not circuit court, precedent (Supplemental Report, ECF No. 18, PageID 1218-19).

In his most recent Objections, Remillard criticizes the Magistrate Judge for not discussing any of the facts supporting the accident defense, without providing any record citations for the facts to which he is referring. (Objections, ECF No. 19, PageID 1250). The Fifth District summarized Remillard's testimony as follows:

> {¶16} He [Remillard] drank some of the beer and was talking with Nick while Nick was playing video games. He told Nick that he had almost committed suicide earlier that day and, in response to Nick's question, stated he would have used "his" revolver. He brought Roy Daubenspeck's gun down from his room to show Nick and they purportedly handled the weapon and discussed how it looked similar to a weapon used by a fictional television character. Appellant decided to return the gun to Daubenspeck's house and as he left, he inexplicably decided to "dry fire" the weapon into the wall.[1] The gun discharged into the wall and Appellant stated he was shocked by the report. He fumbled with the weapon and though he does not deny that it discharged a second time, his testimony does not provide a clear explanation of the second shot. During his testimony he did not expressly state that he was aware that the gun fired a second time:
>
>> I immediately jumped, because I wasn't expecting it to go off. I went and just started fumbling with it to get the cylinder out. When it sticks we usually put our hand across the release and signal(sic) the hammer back which kind of advances it inside. The only thing I can assume is that the hammer slapped back and hit a shell, but it would be around this (indicating) distance, maybe a little further this

(indicating) way. But I was trying to get the gun after it fired back to my neighbor and put it away and pretend that I never even took it from him. I immediately went out to the porch. I had no idea Nick got hit.

{¶17} Appellant described how he left the home, unloaded the weapon and returned the bullets to the jar on the shelf in Daubenspeck's home. He kept the empty shells and the weapon and, until he returned to the house, he claims that he did not know that Nick had been shot. When he returned home, he found Nick bleeding profusely and responded to Nick's request for water, but claims to recall little more after Nick fell silent. He does recall living in the streets and the details of his disposal of the gun. He separated the bullets, the cylinder and the body of the pistol and put the pistol in a potato chip bag and tossed it into the Kokosing River. He put the cylinder in a black sock and "whipped it into the first pond at Foundation Park" and threw the bullets in the river. He had no recollection of writing the eight page note, Exhibit 7, which provided a much different version of the story.

*State v. Remillard, supra.* The appeals court then proceeded to summarize the relevant content of the note which the deputies found:

{¶18} Exhibit 7 is the note allegedly drafted by Appellant after the shooting. The entire note was read to the jury without objection. Some significant statements include:

As for yesterday, I woke in such pain and hate that all that my head was thinking was to kill everybody that was harmed -- that has harmed me my whole life.
* * *
So I was just going to ride my bike somewhere and shoot myself, but I have no idea how Nick got in the way. I know I fired a round into the wall to maybe let him know to leave me alone or something, but all I remember is him keep doing or saying whatever he was saying or doing, and I shoot him. At that point my mind just wanted to kill my family in mass.
* * *
Other than me shooting Nick, my mind is blank and tormented.
* * *
My mind is in so many places with no real me inside that I just couldn't keep going anymore. I'm a fucked up mess, and I killed Nick, fuck.
* * *
I was just going to ride my bike somewhere and shoot myself. I was relieved with my own demise and end, the end of my constant pain and misery but something took me elsewhere, something inside that I just can't keep away.

21

> \* \* \*
>
> He never deserved this. There is anything he could have done, I was just going to shoot myself. I kept going downstairs hoping it didn't really happen, that it was just a nightmare, but it wasn't. I killed Nick.
> \* \* \*
> Though I really did try, I was on my way to kill myself when for whatever reason they wouldn't let me without shooting Nick.
> \* \* \*
> How could I just shoot Nick?
> \* \* \*
> I just knew when I woke up that I wouldn't make it, but Nick was not part of the plan. So much shouldn't have happened, just so much somehow went way wrong with this. I just was going to disappear, no one knowing what become of me, but instead I hurt Nick. He wasn't supposed to be involved in this. What the fuck happened? I am so sorry I shoot him, so fucking not what I was going to do. It was just going to be me that died, not him.
> \* \* \*
> It really should have not happened with Nick. I was just going to kill myself.
>
> {¶19} Appellant conceded that the handwriting in Exhibit 7 appeared to be his, but he offered no reconciliation between his testimony and the version of the facts in his note.

*Id.* The Fifth District went on to overrule the Third Assignment of Error, holding:

> The general instructions clearly instructed jurors that the required *mens rea* was "purposeful" conduct that went beyond conduct considered to be an accident. If the jury believed defendant's accident defense, it would have been required to find him not guilty in accord with the instructions given. *State v. Smiley*, 8th Dist. Cuyahoga No. 03853, 2010-Ohio-4349.

*Id.* at ¶ 68.

Although Petitioner asserts the Fifth District's decision violates § 2254(d)(2), he makes no argument as to how the summary of his testimony is inaccurate or what additional facts appear in the record that would make the Fifth District's decision unreasonable in light of the evidence. The jury was presented with two seriously inconsistent statements of Petitioner about what happened. They obviously believed the account written in the note in the heat of remorse (but after Remillard had seriously

tampered with the evidence) instead of the account constructed to be told at trial.

Petitioner relies on *Stevenson v. United States*, 162 U. S. 313 (1896); *Mathews v. United States*, 485 U.S. 58 (1988); and *Cupp v. Naughten*, 414 U.S. 141 (1973); for the proposition that refusal to give the proposed accident instruction violated his constitutional right to present a complete defense.  The Court agrees with and adopts the Magistrate Judge's interpretation of those cases.

As to the Third Ground for Relief, the Report and Supplemental Report are adopted and Petitioner's Objections are overruled.

## VI.    Certificate of Appealability

In the original Report, the Magistrate Judge noted that reasonable jurists, including several from the Sixth Circuit, had disagreed on the constitutionality of 28 U.S.C. § 2254(d)(1) as related to separation of powers doctrine and he recommended granting a certificate of appealability on that issue.  The Warden's Objections cited a decision of the Sixth Circuit directly to the contrary, *Collins v. Shoop*, No. 18-3766, 2018U.S. App. LEXIS 37673, at *7 (6th Cir. Dec. 17, 2018).  The Magistrate Judge found *Collins* directly in point because Collins sought a certificate of appealability from the Sixth Circuit on the same constitutional grounds raised here and the Sixth Circuit denied the certificate, holding Collins' claim did not "deserve encouragement to proceed further." *Id.*

Having failed to cite *Collins* to the Court despite being counsel of record in that case, Petitioner's counsel now complains that it is an unpublished decision which should have no precedential value. (Objections, ECF No. 19, PageID 1261).  The Court disagrees.  Although the Order in *Collins* is unpublished, it is a very recent Sixth Circuit decision and directly on

point.[5]  Circuit court orders granting or denying certificates of appealability are rarely published and Petitioner has cited no decisions, published or unpublished, granting a certificate on any of his claims of unconstitutionality.  Of course, the Sixth Circuit may have changed its mind on this question.  Petitioner will have an opportunity to test that proposition by seeking a certificate directly from that court.  But on the best precent available to this Court – *Collins* – Petitioner's claims do not merit encouragement to proceed further.

## VII.    Conclusion

Based on a *de novo* review of those portions of the Report and Supplemental Report to which substantial objection has been made, the Court adopts the Report and Supplemental Report and overrules Petitioner's Objections.  Because reasonable jurists would not disagree with this conclusion, Petitioner is denied a certificate of appealability and the Court certifies to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

 /s/ Sarah D. Morrison
**Sarah D. Morrison**
**United States District Judge**

---

[5]Petitioner notes he did not seek a certificate in that case on a Privileges or Immunities (Citizenship) or Thirteenth Amendment claim.  But as noted above, those theories are even less supported by relevant judicial opinion than his separation of powers argument.